IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
**Anatoly Noskov**, an individual,    )
     )
    Plaintiff,     )
     )
v.     )
     )
**John Roth**, an individual,    )
**Roth Immigration Law Firm,**    )
**PLLC**, a New York Prof.    )     COMPLAINT
Service LLC,    )
     )
    Defendants.    )     Civil Action No. 7:19-cv-07431
_____ )

### COMPLAINT AGAINST DEFENDANTS

Plaintiff, Anatoly Noskov (herein "Plaintiff" or "Noskov"), by and through his attorneys, Barr Law Group, as and for the Complaint against Defendants, John Roth and Roth Immigration Law Firm, PLLC (collected and individually as appropriate the "Defendant" or "Roth"), hereby avers the following facts and allegations:

### I.  Parties

1.     The Plaintiff, Anatoly Noskov ("Noskov"), is an individual residing in Newport Beach, California.

2.     Attorney Roth is an attorney, duly admitted to practice law in New York, with a principal place of business at 1001 Avenue of the Americas, 12th Floor, New York, New York.

### II.  Jurisdiction and Venue

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) as the matter in controversy exceeds the sum or value of $75,000.00 and the Plaintiff and Defendants are residents of different states.

4.      Venue is proper pursuant to 28 U.S.C § 1391(b)(2).

### III. <u>Factual Allegations</u>

5.      Noskov is an Employment-Based, Fifth Preference (referred to herein as the "EB-5 Immigrant Investor Program", the "EB-5 Program", or "EB-5") immigrant investor.

6.      The EB-5 Immigrant Investor Program was created to stimulate the U.S. economy with capital investment from foreign investors. Under the program, foreign investors can receive a permanent visa to live and work in the U.S. if they make a capital investment that satisfies certain conditions over a two-year period, including the creation of jobs.

7.      Under the EB-5 Immigrant Investor Program, foreign investors who invest capital in such a "commercial enterprise" in the United States may petition the United States Customs and Immigration Services ("USCIS") and receive conditional permanent residency status for a two-year period (such a petition is called an "I-526 Petition"). The USCIS defines a "commercial enterprise" as any for-profit activity formed for the ongoing conduct of lawful business.

8.      In general terms, the EB-5 Program allows foreign investors to become eligible for a permanent green card if they make the required investment in a commercial enterprise in the U.S. and plan to create or preserve at least ten (10) permanent full-time jobs for qualified U.S. workers.

9.      While the EB-5 Program is, on one hand, an immigration program, it is fundamentally an investment program, involving the marketing and sale of an investment interest.

10.     The EB-5 Immigrant Investor Program requires a showing that the foreign investor "has placed the required amount of capital at risk for the purpose of generating a return on the capital placed at risk."

11.     If the foreign investor satisfies these and other conditions within the two-year period, the foreign investor may apply to have the conditions removed from his or her visa to live and work in the United States permanently.

12.     Using the EB-5 Program, the promoters create a pathway for a foreign national to gain permanent residency here in the United States.  They also provide a pathway for the flow of billions of dollars in investor funds within the United States.  Included with this massive amount of investment flow is the potential for lucrative consultancy opportunities, brokerage opportunities, a micro-economy of administrative and transactional business opportunities, as well as hidden kickbacks -- commissions, referral fees, and the like -- for those who direct investment towards a particular promoter's project.

13.     Roth holds himself out to be an experienced EB-5 attorney and financial consultant with a nationwide presence.

14.     In May of 2014, Noskov reached out to Attorney Roth, in order to obtain legal advice with regard to a potential EB-5 investment (including both the immigration and due diligence aspects of such an investment).

15.     On May 15, 2014, Noskov emailed Attorney Roth, and stated that, generally, he needed legal representation and "due diligence" in regard to "several recommendations" for an EB-5 endeavor, including specifically review of a project (in Seattle) for which Noskov had already begun the commitment process.

16.     At that time, Noskov had begun the process of committing to a specific EB-5 project, but he requested that Attorney Roth "make due diligence, to figure out if everything [is] ok and legal."

17.     In that same May 15, 2014 email, Noskov informed Attorney Roth that there could be "possible misunderstanding due to [his] english level," as Noskov's primary language is Russian.

18.     Attorney Roth responded that he would assist and work with Noskov on "this very important matter."

19.     After being contacted by Noskov, Attorney Roth sent Noskov an engagement agreement (the "Engagement Agreement").

20.     The Engagement Agreement provides as follows:

> [This] agreement will confirm the terms upon which you have retained our firm to provide financial and legal consultancy services.  The services to be rendered will consist of providing you with detailed information about various USCIS designated EB-5 Pilot Program regional centers and their investment projects with the goal of helping you select a EB-5 Pilot Program regional center project best suited to your investment objectives.

21.     Amongst other things, the Engagement Agreement provided that Attorney Roth's legal and financial review would include analysis and evaluation of a project's financials; a project's offering documents, including any private placement memorandum; a project's compliance within USCIS regulations (the federal administrator of the EB-5 program); as well as appropriate risk assessment.

22.     The Engagement Agreement directs Noskov to "[s]ign and complete this form to authorize the Roth Immigration Law Firm to make a one-time debit to your credit card listed below."

23.     As directed, Noskov made the required payment to the Roth Immigration Law Firm on or about May 19, 2014.

24.     After receipt of the Engagement Agreement (on May 20, 2014) and the engagement payment, Attorney Roth responded to Noskov's initial inquiry and dissuaded him from the initial Seattle based EB-5 project, as follows:

> I have to say that even a cursory evaluation of the Seattle Regional Center raises some disturbing issues. It's highly irregular for a CEO of a Regional Center to be also acting as an investor's attorney for the I-526 petition. It's also odd that you are being asked to sign documents before you have seen the offering documents for the individual project offering. Why did you decide to invest in a project from this Regional Center? What is your relationship with Kevin Stemper? Who recruited you as an investor and how?

25.     Noskov then asked Attorney Roth which "EB-5 project [he] would recommend in case we denied the Seattle regional center."

26.     Attorney Roth then suggested a restaurant project, however, he further stated that "[w]e have more coming, too."

27.     In response, Noskov inquired as to both the legal and financial aspects of the suggestion. Attorney Roth answered Noskov's legal questions, and then brought up a another "franchise project that expects to pay 4% from a very reliable sponsor."

28.     Attorney Roth proceeded to promote an opportunity with an EB-5 offering in Florida, through a franchisor known as "Tap House Holdings" (the "Project").

29.     The Project was organized by Mike Xenick, principal of InvestAmerica Capital Advisors, LLC ("InvestAmerica").

30.     Xenick and Attorney Roth previously worked together promoting investment offerings.

31.     Attorney Roth introduced Xenick as a "very knowledgeable, careful, and thorough guy" and stated that these restaurants are "doing right well across-the-board."

32.     InvestAmerica Capital Advisors promotes itself as, amongst other things, a provider of "EB-5 advisory services, comprehensive due-diligence, transaction, and support services to the highest quality of Regional Centers, Project Owners, Developers, and companies wishing to utilize EB-5 capital for growth and acquisition financing."

33.     According to the offering documents from the Project, the "Company has retained International Assets Advisory, LLC, a Broker Dealer firm ("IAA") that is a member in good standing with the Financial Industry Regulatory Authority ("FINRA") and the Securities Investor Protection Corporation ("SIPC"), as the exclusive placement agent to assist with the Offering.  The portion of each Subscription Price that constitutes the Administrative Fee will be paid to IAA as a commission in connection with IAA's engagement."

34.     Though InvestAmerica was the organizer of the project, Richard Reeves and Mark Krumin were represented as the "Management Team" of the Project.

35.     Roth presented Reeves as the would-be President of the endeavor, and he was represented as an experienced and successful restaurateur, principally in his successes as a franchisee of several "World of Beer" restaurants  (World of Beer is a restaurant and tavern chain with locations throughout the United States, China and South Korea).

36.     Roth also represented Krumin as an experienced and successful restaurateur, principally in his successes as a franchisee of several "World of Beer" restaurants.

37.     As billed, the Project projected an investor return of 4% annually, plus 15% profits.

38.     In addition to presenting the Project to Noskov, Attorney Roth gave Noskov advice and opinions based on his purported legal analysis and due diligence, giving the project an "A" in relation to the "probability to get green card" (which again required the financial success of the

endeavor in order to create the requisite number of jobs) and "[f]or getting money back, I give A- because you never how the locations will perform."

39.     Despite being retained to provide both legal and financial due diligence for the project, Attorney Roth performed no meaningful analysis, instead providing a summary promotion and approval of the Project (in a written analysis), wherein Attorney Roth identified no risk factors.

40.     Attorney Roth gave the identical glowing recommendation to other investors who reached out to Attorney Roth for advice.

41.     Despite his representations, Attorney Roth did not review any relevant financial documents or conduct any due diligence in reaching these conclusions and recommendations for the Project.

42.     Proper due diligence would have been revealed that, in fact, the Project's management had never achieved any of the projected results in their World of Beer restaurants and that, in fact, the Management Team's existing portfolios were losing money.

43.     Based on, and because of, Roth's representations and recommendations (including the representation that his analysis and recommendations would be based upon legal and financial due diligence), Noskov subscribed to the Project and committed his investment of $500,000.00 in addition to a $45,000.00 administrative fee.

44.     Attorney Roth similarly reported that the Project would create seventeen (17) jobs per investor, however, basic due diligence of the Project and proper comparison of the Management Team's performance in the World of Beer endeavors did not support anywhere near that level of job creation.

45.     Despite giving the positive assessment of the Project and the Management Team, Attorney Roth did not request or review any of the Management Team's relevant financial and/or

management performance.  Proper due diligence would have revealed that; indeed, risk and loss was rampant and unavoidable.

46.     The Project's projections were based on nothing but lies and fictions, jeopardizing both Noskov's investment and his immigration prospects.

47.     For instance, the Project failed to create and maintain even ten (10) full-time jobs per investor, let alone the baseless fifteen (17) to seventeen (17) direct full-time jobs for each investor.

48.     In addition to the financial problems, the Project failed to fulfill its obligations under the basic duties to its EB-5 investors, including preparation of the documents necessary to support "I-829 Petitions" (the petitions submitted to USCIS to remove the conditions of an investor's green card).

49.     In December of 2017, Noskov was informed of the reason for Attorney Roth's glowing recommendations, which had nothing to do with meaningful analysis.  In an email from Xenick (in which Roth demanded that the systematic problems with the restaurant be addressed), Xenick informed Noskov that Attorney Roth had accepted "a good portion" of the "$45,000.00" that was earmarked for International Assets Advisory, LLC (the disclosed broker in the offering documents).

50.     Attorney Roth's analysis was driven by his desire to accept this impermissible payment from the issuer of the security, putting his interests above those of his client.

51.      Reeves and Krumin managed and operated ten (10) World of Beer locations, and, contrary to Roth's assertions, each consistently ran at a loss even with high sales volume; all but one (which was running at a loss and sold back to the franchisor) ultimately and predictably failed as follows:

1) World of Beer Clematis St, West Palm Beach, FL - opened 2011, closed 2016;
2) World of Beer Dadeland, FL - opened 2012, closed 2017;
3) World of Beer Charlotte, NC - opened 2012, closed 2015;
4) World of Beer Wellington, FL - opened 2012, closed 2017;
5) World of Beer Kendall, Miami, FL - opened 2014, closed 2017;
6) World of Beer Stone Oak, San Antonio, TX - opened 2012, closed 2015;
7) World of Beer Midtown, Miami, FL - opened 2013, closed 2017;
8) World of Beer Broken Spoke, Austin, TX - opened 2015, closed 2016; and
9) World of Beer Kennesaw, GA - opened 2014, closed 2017.

52.     By 2018, both Reeves and Krumin filed for bankruptcy and all of their World of Beer stores had failed.

53.     Had Roth performed any of the due diligence promised and fulfilled any of his duties as a fiduciary, and had he refrained from making the baseless and glowing recommendations for the Project, Noskov would have invested in another project; would have avoided the significant losses and additional expenses he has been forced to incur in order to salvage his EB-5 investment endeavor; and avoided additional and otherwise unnecessary expenditures that he was forced to undertake in order to save his EB-5 immigration endeavor (including but not limited to over $80,000.00 in direct out-of-pocket expenditures pushed in the Project).

## IV.  CAUSES OF ACTION

### COUNT I
### MALPRACTICE

54.     Plaintiff Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

55.     At all relevant times, Roth owed Noskov a duty of care arising from the attorney-client relationship.

56.     By Roth's representations, Roth owed Noskov a duty of care to exercise professional skill commensurate with Roth's expertise and superior legal skill, knowledge, and ethical standards.

57.     In the course of the representation of Noskov, Roth breached his duties to Noskov by failing to exercise reasonable care and skill in handling his case.

58.     In the course of the representation of Noskov, Roth breached his duty to Noskov by failing to exercise the care and skill expected of specialized attorneys (as represented by Roth).

59.     In the course of the representation of Noskov, Roth breached his duty to Noskov by taking actions contrary to Noskov's interests and by concealing material information from him.

60.     In the course of the representation of Noskov, Roth breached the duty of care owed to Noskov by actively committing and condoning multiple violations of the New York Rules of Professional Conduct.

61.     Were it not for Roth's multiple breaches of his duty of care as an attorney, and the multiple breaches of his duties within the attorney-client relationship, Noskov would not have incurred any of the damages and financial expenditures that he has been forced to incur by subscribing to the fraudulent business opportunity.

62.     As a proximate cause of Roth's breaches and wrongdoing, Noskov suffered, and continues to suffer, harm and damages.

### COUNT II
### BREACH OF CONTRACT

63.     Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

64.     In his representation of Noskov, Roth agreed to bill Noskov and retain payment for legal services performed on his behalf.

65.     In his representation of Noskov, Roth billed Noskov and retained payments from him for legal and due diligence services that were not performed and for services that were falsely represented to have been performed.

66.     For good and valuable consideration, Roth agreed to provide legal and due diligence services on Noskov's behalf for his benefit in his EB-5 immigrant investment, including analysis and disclosure of material information as it relates to that investment.

67.     Roth breached the contract with Noskov by failing to provide legal services that were contracted for and by failing to analyze and disclose material information.

68.     As a consequence of Roth's breach, Noskov suffered and continues to suffer harm and damages in an amount to be determined at trial.

**COUNT III**
**BREACH OF GOOD FAITH AND FAIR DEALING**

69.     Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

70.     At all relevant times, Roth was bound to execute the agreement for representation and legal services consistent with the covenant of good faith and fair dealing.

71.     Noskov expended money and resources to both pay and assist Roth in his representation according to the necessity of preparing the EB-5 investments, and the concomitant analysis and review of material information related thereto.

72.     Noskov reasonably expected that the money and expenditure of time and resources were being used by Roth in preparing Noskov's EB-5 investment process, and the concomitant analysis and review of material information related thereto.

73.     In fact, Noskov's money, time, and resources were not being used in preparing and analyzing the EB-5 investment, and the concomitant review of material information related thereto.

74.     As a consequence of Roth's wrongful acts and conduct, Noskov has suffered and continue to suffer harm and damages, and Roth has been, and continues to be, unjustly enriched.

## COUNT IV
## QUANTUM MERUIT/UNJUST ENRICHMENT

75.     Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

76.     Roth billed Noskov for legal and due diligence services that were not performed.

77.     Roth accepted and retained consideration for legal and due diligence services that were not performed.

78.     As a consequence of Roth's wrongful acts and conduct, Noskov has suffered, and continues to suffer, harm and damages, and Roth has been, and continues to be, unjustly enriched.

## COUNT V
## BREACHES OF FIDUCIARY DUTIES

79.     Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

80.     At all times relevant herein, Roth acted in a fiduciary capacity in relation to Noskov and his EB-5 investment interests.

81.     In his representation of Noskov, Roth was required to execute fiduciary duties by acting in good faith and with loyalty for the advancement of Noskov's interests, and with the care of an ordinarily prudent person in a like position would exercise under similar circumstances.

82.     Roth had a duty to avoid conflicts of interest that may have impaired Roth's ability to exercise independent professional judgment on behalf of Noskov.

83.     Roth had a corresponding duty to disclose potential conflicts to Noskov, and to obtain informed consent for continuation of the representation in light of those potential conflicts.

84.     Roth had a corresponding duty to represent Noskov without allowing potential conflicts to impair or affect Roth's prudent judgment and proper representation of Noskov.

85.     Roth breached his fiduciary duties because he failed to act in good faith, failed to act with loyalty in the advancement of Noskov's interests, and failed to act with the care of an ordinarily prudent person in a like position would exercise under similar circumstances by funneling Roth's money, time, and resources into the Project that was, in effect, a fraud.

86.     Roth breached his fiduciary duties because he failed to avoid conflicts of interest, failed to disclose any and all conflicts of interest, and allowed conflicts of interest to affect his prudent judgment and representation of Noskov.

87.      Roth breached his fiduciary duties by failing to investigate and/or disclose any and all material and necessary facts to Noskov prior to his investments in the Project.

88.     But for Roth's wrongful acts and conduct, Noskov would not have invested in the Project.

89.     As a consequence of Roth's wrongful acts and conduct, Noskov suffered, and continue to suffer, harm and damages.

90.     As a consequence of Roth's wrongful conduct and fiduciary breaches, Roth should be disgorged of all amounts Roth received as the result of the representation of Noskov.

## Count VI
## Violations of New York General Business Law § 349

91.     Noskov incorporates the factual allegations of this Complaint as if fully set forth hereunder.

92.     Roth advertised his services as an experienced and specialized immigration attorney, capable of assisting foreign nationals, who had limited to no knowledge of United States laws, practices or customs, and who sought to immigrate to the United States, including New York.

93.	Concurrent with such legal representation, as was the case with Noskov and others, Roth coordinated his activities with the issuers of the securities being pitched to his investor-clients.  Roth coordinated marketing and promotion of these issuers' securities, and he cultivated undisclosed relationships and agreements that created an impermissible and intolerable conflict of interest that foreclosed his ability to fulfill his role within the attorney-client relationship.

94.	As was the case with Noskov and others, Roth's impermissible attempt to serve as legal advisor to immigrant-investors and, at the same time, as a promoter of the securities for which his immigrant-clients sought due diligence, led to an impermissible conflict of interest and misleading presentation of Roth's roles in the transaction.

95.	Further Roth's actions, presentation, and marketing of himself as a specialized attorney, who provided legal and unconflicted due diligence, served to mask Roth's dual role and to mask his inherent self-interest in his clients' investment choice.

96.	Roth's marketing of himself and his business practices were aimed at Noskov and the public-at-large.

97.	Roth's marketing and Roth's impermissible servicing of both the issuer of the security and his legal clients in the same transaction, all served to mislead his clients as to his role and interests within the scope of the representation and within the investment being offered.

98.	Roth's role and monetary relationship with the issuer of the securities and dual role as a purportedly unconflicted attorney are impermissible in any situation; however, further, but for actually being misled in the roles that Roth played in the transaction and representation, Noskov would not have hired Roth, paid Roth money, and Noskov would not have relied upon Roth's advice in committing to the securities offering.

99.     As the result of Roth's unfair and deceptive trade practices, Roth and others have suffered, and continue to suffer, harm and damages.

## V. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Noskov respectfully request the following relief from Defendants:

1. Compensatory, consequential, and general damages in an amount to be determined at trial;

2. Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants (including specifically but not limited to all amounts paid to Roth by Noskov and paid to Roth as the result of Noskov's investment);

3. Punitive and multiple damages as the result of Roth's acceptance of undisclosed and illegal payments from a securities issuer, in order to deter Roth's and other from similar conduct;

4. Treble damages, his attorney's fees in pursuing this action, and all statutory damages pursuant to General Business Law §349;

5. Costs and disbursements of the action;

6. Pre- and post-judgment interest; and

7. Such other relief as this Court deems just and proper.

## VI. <u>JURY TRIAL DEMAND</u>

PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE

[intentionally left blank]

Dated: August 8, 2019
      Stowe, Vermont                   Respectfully Submitted,

                                           BARR LAW GROUP


By: /s/ *Russell D. Barr*
            Russell D. Barr
            Chandler W. Matson
            125 Mountain Road
            Stowe, VT 05672
            Phone: 802.253.6272
            Fax: 802.253.6055
            Email: russ@barrlaw.com
                    chandler@barrlaw.com