UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

> USDC-SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC#:
> DATE FILED: 7/17/2020

---

ANATOLY NOSKOV,

                          Plaintiff,

          v.

JOHN ROTH AND ROTH IMMIGRATION
LAW FIRM, PLLC,

                          Defendants.

No. 19-CV-7431 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Anatoly Noskov filed this action against Defendants John Roth and Roth Immigration Law Firm, asserting claims for legal malpractice, breach of contract, breach of good faith and fair dealing, quantum meruit/unjust enrichment, breach of fiduciary duties, and violations of New York General Business Law § 349. Now before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that all of Plaintiff's claims are barred by the applicable statutes of limitations. For the reasons that follow, Defendants' motion is granted.

## BACKGROUND[1]

### I.     Factual Background

Plaintiff is an "Employment-Based Fifth Preference" ("EB-5 Program" or "EB-5") immigrant investor who resides in California. Compl. ¶¶ 1, 5. According to the Complaint, the EB-5 Program provides foreign investors with the ability to receive permanent visas to live and

---

[1] The following facts are drawn from Plaintiff's Complaint ("Compl."), and are assumed to be true for the purpose of resolving this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017).

work in the United States "if they make a capital investment that satisfies certain conditions over a two-year period." *Id.* ¶ 6.  Foreign investors who "invest capital in such a 'commercial enterprise' in the United States"—defined as "any for-profit activity formed for the ongoing conduct of lawful business"—may then petition the United State Customs and Immigration Services ("USCIS") to "receive conditional permanent residency for a two-year period." *Id.* ¶ 7.  Thus, Plaintiff asserts, the EB-5 Program "allows foreign investors to become eligible for a permanent green card if they make the required investment in a commercial enterprise in the U.S. and plan to create or preserve at least ten (10) permanent full-time jobs for qualified U.S. workers." *Id.* ¶ 8.

In May 2014, Plaintiff "reached out" to Defendant John Roth, a New York-based attorney, for legal advice regarding a potential EB-5 investment in a Seattle-based project.  *See id.* ¶ 14. According to Plaintiff, Roth "holds himself out to be an experienced EB-5 attorney and financial consultant with a nationwide presence." *Id.* ¶ 13.  Specifically, Plaintiff emailed Roth on May 15, 2014, seeking "legal representation and 'due diligence' in regard to 'several recommendations' for an EB-5 endeavor." *Id.* ¶ 15.  Plaintiff alleges that at that point, he had already started the process of "committing to a specific EB-5 project," but nonetheless requested that Roth "make due diligence, to figure out if everything [was] ok and legal." *Id.* ¶ 16.  Plaintiff asserts that Roth responded to his inquiry by stating that "he would assist and work with [Plaintiff] on 'this very important matter.'" *Id.* ¶ 18.

Plaintiff alleges that Roth subsequently sent him an engagement agreement (the "Engagement Agreement"), which formalized the terms by which Plaintiff retained Roth and his law firm, Roth Immigration Law Firm, for "financial and legal consultancy services." *Id.* ¶¶ 19-20.  The Engagement Agreement stated that Defendants would "provid[e] [Plaintiff] with detailed information about various USCIS designated EB-5 Pilot Program regional centers and their

investment projects[,] with the goal of helping [him] select" such a project for investment.  *See id.* ¶ 20.  Plaintiff contends that, on May 19, 2014, he made the required "one-time" payment to Roth Immigration Law Firm pursuant to the terms of the Engagement Agreement.  *See id.* ¶¶ 22-23.

According to Plaintiff, on the following day, May 20th, Roth "dissuaded" him from investing in the Seattle-based project he had initially brought to Roth's attention, and instead recommended that Plaintiff invest in an EB-5 restaurant project based in Florida, which was run by a franchisor known as "Tap House Holdings" (the "Project").  *See id.* ¶¶ 24, 28.  The Project was apparently organized by Mike Xenick, a principal of InvestAmerica Capital Advisors, LLC ("InvestAmerica"), who had previously worked with Roth "promoting investment offerings."  *See id.* ¶¶ 29-30.  Plaintiff maintains that, although InvestAmerica was the "organizer" of the Project, individuals named Richard Reeves and Mark Krumin were "represented" as its "Management Team."  *Id.* ¶ 34.  Roth allegedly spoke very highly of Xenick, InvestAmerica, Reeves, and Krumin.  *See id.* ¶¶ 31-32, 35-36.  As to the Project itself, Roth gave Plaintiff "advice and opinions based on his purported legal analysis and due diligence," including giving the Project an "A" in relation to the "probability to get green card," and an "A-" for "getting money back" because, as Roth explained, "you never [know] how the locations will perform."  *Id.* ¶ 38.  Roth also allegedly reported that the Project would create 17 jobs per investor.  *See id.* ¶ 44.  In light of Roth's "glowing recommendation," and "[b]ased on, and because of, Roth's representations and recommendations," Plaintiff decided to invest in the Project.  *See id.* ¶¶ 40, 43.  He subsequently committed an investment of $500,000, as well paid a $45,000 administrative fee pursuant to a Subscription Agreement dated July 17, 2014.  *See id.* ¶ 43; Roth Aff. Ex. C, Dkt. 28-4, at 14-15.[2]

---

[2] The Court may consider the Subscription Agreement, as it is "integral" to the Complaint.  *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002); *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (considering, in the 12(b)(6) context, a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls" as "integral" to the complaint) (citation omitted).

Plaintiff avers that, contrary to Roth's representations, the Project's projections were "based on nothing but lies and fictions," which jeopardized both his investment and his immigration prospects.  *See id.* ¶ 46.  In particular, Plaintiff alleges that Roth "performed no meaningful analysis" of the Project, despite "being retained to provide both legal and financial due diligence," and instead provided only a "summary promotion and approval of the Project," which apparently identified "no risk factors."  *Id.* ¶ 39.  Plaintiff also claims that Roth did not "review any relevant financial documents or conduct any due diligence in reaching [his] conclusions and recommendations for the Project."  *Id.* ¶ 41.  Roth allegedly did not, for instance, "request or review any of the Management Team's relevant financial and/or management performance," even though he had provided a "positive assessment of the Project and the Management Team."  *Id.* ¶ 45.

Plaintiff contends that "[p]roper due diligence" would have revealed that "the Project's management had never achieved any of the projected results in their World of Beer restaurants,"[3] that "in fact, the Management Team's existing portfolios were losing money," and that "risk and loss was rampant and unavoidable."  *Id.* ¶¶ 42, 45.  Ultimately, Plaintiff asserts, the Project itself suffered from "financial problems," failed to "create and maintain" even 10 full-time jobs per investor, and failed to "fulfill its obligations under the basic duties to its EB-5 investors."  *See id.* ¶¶ 47-48.  According to Plaintiff, if Roth had "performed any of the due diligence promised" and/or "fulfilled any of his duties as a fiduciary," including by "refrain[ing] from making the baseless and glowing recommendations for the Project," Plaintiff would have invested in a different project and

---

[3] Both Reeves and Krumin were represented to Plaintiff as "experienced and successful restaurateur[s]," particularly with regard to their "successes as [] franchisee[s] of several 'World of Beer' restaurants."  *See id.* ¶¶ 35-36.  Plaintiff maintains that contrary to Roth's assertions, each of the "World of Beer" locations managed and operated by Reeves and Krumin "consistently ran at a loss," that virtually all of the locations "predictably failed," and that by 2018, both Reeves and Krumin had filed for bankruptcy and "all of their World of Beer stores had failed."  *Id.* ¶¶ 51-52.

avoided "the significant losses and additional expenses he has been forced to incur in order to salvage his EB-5 investment endeavor," among other things. *Id.* ¶ 53.

Finally, Plaintiff alleges that in December 2017, Xenick informed him of "the reason" for Roth's "glowing recommendations" for the Project and its Management Team, which apparently "had nothing to do with meaningful analysis." *See id.* ¶ 49. Specifically, Xenick sent Plaintiff an email indicating that Roth "had accepted 'a good portion' of the '$45,000.00'" that was "earmarked" for International Assets Advisory, LLC ("IAA"), the disclosed broker dealer in the Project's offering documents. *See id.* ¶ 49. Plaintiff contends that Roth's analysis for the Project was thus "driven by his desire to accept this impermissible payment from the issuer of the security, putting his interests above those of [Plaintiff], his client." *Id.* ¶ 50. As such, Roth allegedly breached his duties as Plaintiff's attorney—pursuant to the attorney-client relationship established in May 2014—by marketing himself as "an experienced and specialized immigration attorney" who "provided legal and unconflicted due diligence." *Id.* ¶¶ 92, 95. Roth also allegedly took "actions contrary to [Plaintiff's] interests" and "conceal[ed] material information from him." *Id.* ¶ 59. Although Roth was retained to provide such legal services, Plaintiff claims that Roth failed to avoid or disclose conflicts of interest in the course of his representation, *id.* ¶ 86, failed "to investigate and/or disclose any and all material and necessary facts to [Plaintiff] prior to his investments in the Project," *id.* ¶ 87, and ultimately encouraged Plaintiff to "subscrib[e] to the fraudulent business opportunity," which caused him to incur "damages and financial expenditures" that he "would not have incurred" otherwise, *id.* ¶ 61.

## II.     Procedural History

Plaintiff commenced this action on August 8, 2019. *See* Dkt. 1. On December 5, 2019, Defendants moved to dismiss, pursuant to Rule 12(b)(6), on statute-of-limitation grounds. *See*

Dkts. 28, 28-5.  Plaintiff filed his opposition on January 30, 2020, *see* Dkt. 35, and Defendants replied on February 20, 2020, *see* Dkt. 36.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  On a Rule 12(b)(6) motion, the question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529-30 (2011) (citation omitted).  In answering this question, the Court must "accept[] all factual allegations as true, but 'giv[e] no effect to legal conclusions couched as factual allegations.'" *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (quoting *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010).  On a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  Moreover, "[e]ven where a document is not incorporated by reference in the complaint, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

"Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (quoting *Ellul v. Congregation on Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014)). Nonetheless, "[d]ismissing claims on statute of limitations grounds at the complaint stage 'is appropriate only if a complaint clearly shows the claim is out of time.'" *Shak v. JPMorgan Chase & Co.*, 156 F. Supp. 3d 462, 474 (S.D.N.Y. 2016) (quoting *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999)); *see also Mosdos Chofetz Chaim, Inc. v. RBS Citizens, N.A.*, 14 F. Supp. 3d 191, 209 (S.D.N.Y. 2014) ("Because the defendants bear the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run.") (alterations, internal quotation marks, and citation omitted).

## DISCUSSION

Plaintiff brings six causes of action: (1) malpractice (Count I); (2) breach of contract (Count II); (3) breach of good faith and fair dealing (Count III); (4) quantum meruit/unjust enrichment (Count IV); (5) breaches of fiduciary duties (Count V); and (6) violations of New York General Business Law § 349 (Count VI). As a preliminary matter, Plaintiff "concedes the dismissal" of Counts II, III, and IV "as pled," because—he admits—"these causes of action overlap with the Malpractice and Breach of Fiduciary Claims." Pl. Opp'n at 21. Plaintiff maintains that he "will seek to replead" these claims to "recover specifically for the improperly disclosed payment based upon its true status," which he asserts is "outright theft and fraud." *Id.* The Court addresses Plaintiff's request to replead Counts II, III, and IV below. The remainder of Plaintiff's claims— for legal malpractice, breach of fiduciary duties, and violations of § 349—all arise out of

Defendants' legal representation of him in connection with the EB-5 project discussed above, and their alleged deception in redirecting Plaintiff's investment to the Project and concealing their financial connection to it.  *See id.* at 1-2.  Defendants allegedly engaged in this deceptive behavior so that they could profit from the $45,000 "ill-gotten referral fee."  *See id.* at 3, 17.  For the reasons that follow, the Court concludes that the statute of limitations has expired for these three claims, and that they are not subject to equitable estoppel or equitable tolling.  Accordingly, Defendants' motion is granted.

## I.      Applicable Statutes of Limitations

### A.  Malpractice

Under New York law, the statute of limitations for an action to recover damages for legal malpractice is three years.  *See* N.Y. C.P.L.R. § 214(6).  The limitations period begins to accrue "not when the plaintiff discovers the legal malpractice, but when the malpractice is committed."  *See De Carlo v. Ratner*, 204 F. Supp. 2d 630, 635 (S.D.N.Y. 2002); *see also Shumsky v. Eisenstein*, 96 N.Y.2d 164, 166 (2001) ("An action to recover damages for legal malpractice accrues when the malpractice is committed . . . not when the client discovered it.") (internal quotation marks and citation omitted); *Boyd v. Gering, Gross & Gross*, 226 A.D.2d 489, 489 (2d Dep't 1996) ("The law is well settled that an action to recover damages for legal malpractice accrues when the malpractice is committed.").

Plaintiff's malpractice claim is based on Roth's alleged breaches of his duties as his attorney and "within the attorney-client relationship."  *See* Compl. ¶ 61.  Plaintiff avers that Roth's alleged malpractice led him to "subscrib[e] to the fraudulent business opportunity."  *See id.*.  Pursuant to the Engagement Agreement, Plaintiff retained Defendants on May 19, 2014 for "legal consultancy services," including to provide him with detailed information about potential investment projects that aligned with the EB-5 program.  *See* Compl. ¶ 20; *see also* Pl. Opp'n at

8

4-5 (stating that the "attorney-client relationship was established with Roth and his law firm" when Plaintiff "executed the Engagement Letter and submitted his credit card payment" on May 19, 2014). He argues that Defendants committed malpractice when Roth "breached his attorney obligations" because he "was in a unique position to know that [the Project] was doomed from the beginning . . . and yet provided no meaningful analysis" of the Project, especially its "job creating aspects" and "ability to procure a green card" for Plaintiff. *See* Pl. Opp'n at 10, 12. Moreover, Plaintiff maintains that Defendants were "hopelessly conflicted in their representation of [him]" because the "undisclosed referral fee" that Roth apparently received "tainted the legal and ethical responsibilities that Roth had to [him]." *See id.* at 1, 12. Nonetheless, Plaintiff entered into the Subscription Agreement with Tap House Holdings on July 17, 2014, *see* Roth Aff. Ex. C, and does not seem to dispute that the Complaint contains no allegations of any professional interactions with Defendants thereafter. As the Complaint is devoid of any alleged malpractice on the part of Defendants after July 2014, Plaintiff's legal malpractice claim accrued—at the latest—in July 2014 and elapsed three years later, in July 2017. The malpractice claim is thus time-barred under § 214(6). *See, e.g.*, *Tenamee v. Schmukler*, 438 F. Supp 2d 438, 443 (S.D.N.Y. 2006) (dismissing legal malpractice claim as time-barred on a 12(b)(6) motion where it was filed more than a year and a half after the three-year malpractice statute of limitations under § 214(6)).

### B. Breach of Fiduciary Duties

Under New York law, a claim for breach of fiduciary duty that is "based on the same alleged conduct amounting to legal malpractice" is subject to the same three-year statute of limitations period as the legal malpractice claim. *See Dozier v. Willkie Farr & Gallagher LLP*, No. 09 Civ. 9865 (LMM), 2011 WL 1886397, at *2 (S.D.N.Y. May 10, 2011); *see also, e.g.*, *Morson v. Kreindler & Kreindler, LLP*, 814 F. Supp. 2d 220, 227 (E.D.N.Y. 2011) (concluding

that C.P.L.R. § 214(6) applied to breach of fiduciary duty claim against defendant-attorneys because the claims were based on the same alleged conduct that formed plaintiff's legal malpractice claim).  When a plaintiff brings a breach of fiduciary duty claim that arises from the same facts as a time-barred legal malpractice claim, and fails to assert any separate or distinct allegations, the fiduciary duty claim must also be dismissed as time-barred.  *See, e.g.*, *Hadda v. Lissner & Lissner LLP*, 99 A.D.3d 476, 477 (1st Dep't 2012) (dismissing breach of fiduciary duty claim as time-barred because it was duplicative of time-barred legal malpractice claim); *6645 Owners Corp. v. GMO Realty Corp.*, 306 A.D.2d 97, 98 (1st Dep't 2003) (finding a breach of fiduciary duty claim "barred by the three-year statute of limitations" because it was not "separate and distinct from the alleged legal malpractice").

Plaintiff's breach of fiduciary claim is based on the same alleged misconduct as his malpractice claim.  He asserts that Roth breached his fiduciary duties by "failing to investigate and/or disclose any and all material and necessary facts to [him] prior to his investments in the Project," *see* Compl. ¶ 87, by failing to avoid and disclose his conflicts of interests, *see id.* ¶ 86, and by "fail[ing] to conduct any meaningful due diligence" in connection with the Project, *see* Pl. Opp'n at 16; *cf. id.* at 10-11 (describing his malpractice claim as based on Roth's active concealment of the $45,000 referral fee, failure to do due diligence, and "breach of his ethical duties of disclosure" of his conflict of interest).  Like the legal malpractice claim, this alleged misconduct occurred no later than July 2014, when Plaintiff ultimately subscribed to the Project. Because the conduct alleged in Plaintiff's breach of fiduciary duty claim is not "separate and distinct" from his legal malpractice claim, *see 6645 Owners Corp.*, 306 A.D.2d at 98, Plaintiff's breach of fiduciary duty claim is time-barred by the same three-year statute of limitations under §

214(6).[4] *See also, e.g.*, *Roman y Gordillo, S.C. v. The Bank of N.Y. Mellon Corp.*, No. 12-CV-0212 (DF), 2015 WL 5786460, at *20 (S.D.N.Y. Sept. 29, 2015) (finding breach of fiduciary duty claim based on same alleged conduct as legal malpractice claim brought over three years after accrual time-barred under § 214(6)).

### C. New York General Business Law § 349

Section 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in the State of New York. N.Y. Gen. Bus. L. § 349(a). Section 214(2) of the C.P.L.R. requires plaintiffs to file § 349 claims within three years of accrual. *See* N.Y. C.P.L.R. § 214(2); *see also Statler v. Dell, Inc.*, 775 F. Supp. 2d 474, 484 (E.D.N.Y. 2011) ("Actions brought pursuant to Section 349 must be commenced within three years of the date of accrual."). Accrual for these purposes "occurs when [the] plaintiff has been injured by a deceptive act or practice violating section 349." *Gaidon v. Guardian Life Ins. Co. of America,* 96 N.Y.2d 201, 210 (2001).

Plaintiff's § 349 claim is based on Roth's allegedly deceptive advertising and marketing of his services "as an experienced and specialized immigration attorney," Compl. ¶ 92, who "provided legal and unconflicted due diligence" in his representation of clients, *id.* ¶ 95. Plaintiff

---

[4] In the *absence* of a legal malpractice claim arising out of the same facts as the fiduciary duty claim, New York law provides two limitations periods for breach of fiduciary duty causes of action depending on the relief sought. A three-year limitations period governs breach of fiduciary duty claims seeking monetary relief, while a six-year period applies to breach of fiduciary duty claims seeking equitable relief. *See IDT Corp v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 139 (2009). In addition, some courts have applied a six-year statute of limitations period where allegations of fraud are "essential to a breach of fiduciary duty claim." *Id.* Where a fraud allegation is only "incidental" to the breach of fiduciary duty claim, however, the three-year period applies. *See Kaufman v. Cohen*, 307 A.D.2d 113, 119 (1st Dep't 2003). Plaintiff does not bring a fraud cause of action here. Nor does he argue that his breach of fiduciary duty claim is "based upon fraud." *See id.* at 121. Notwithstanding his two references to a "fraudulent business opportunity," Compl. ¶ 61, and "a fraud," *id.* ¶ 85, in the Complaint, any such fraud is merely incidental to his breach of fiduciary duty cause of action, and the three-year period would thus apply in any event. *See Powers Mercantile Corp v. Feinberg*, 109 A.D.2d 117, 120 (1st Dep't 1985) ("Where the alleged fraud is merely the means of accomplishing the breach and add[s] nothing to the cause of action, the Statute of Limitations applicable to fraud claims will not control.") (internal quotation marks and citation omitted); *Alexander Condo. v. E. 49th St. Dev. II, LLC*, 110 N.Y.S.3d 510, at *9 (N.Y. Sup. Ct. 2018) (finding three-year statute-of-limitations applicable because the alleged fraud was "identical" and "incidental to the [breach of fiduciary duty] claims").

asserts that, but for Roth's misrepresentations, he would not have retained his services—in May 2014—nor relied upon his advice in subscribing to the Project in July 2014.  *See* Compl. ¶ 98. Since "accrual occurs when Plaintiff first suffered injury," *Statler*, 775 F. Supp. 2d at 484, and the allegations in the Complaint demonstrate that Defendants' deception took place between May 2014, when Plaintiff retained Roth and his firm, and July 2014, when he invested in the Project, the deceptive acts occurred—and Plaintiff's § 349 claim accrued—no later than July 2014.  *See, e.g.*, *Brady v. Lynes*, No. 05 Civ. 6540 (DAB), 2008 WL 2276518, at*10 (S.D.N.Y. June 2, 2008) (finding that plaintiff's § 349 cause of action accrued upon "the injury from the deceptive practice," which occurred when plaintiff purchased a counterfeit painting).  Thus, the three-year statute of limitations for the § 349 claim expired in 2017, and it is time-barred as well.  *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, No. 04-CV-2389 (SAS), 2007 WL 1601491, at *16 (S.D.N.Y. June 4, 2007) (dismissing plaintiff's § 349 claim brought over three years after accrual date as time-barred).

## II.     Equitable Doctrines

Because the Court has concluded that Plaintiff's claims for malpractice, breach of fiduciary duty, and violations of § 349 all accrued—at the latest—in July 2014, they are all time-barred.  Indeed, Plaintiff does not contest that the applicable statutes of limitations for each of these claims accrued and expired prior to his filing this action.  He instead urges the Court to apply the doctrines of equitable estoppel and/or equitable tolling based on the argument that Defendants allegedly "concealed their wrongdoing and the source of the [$45,000] referral payment," which they "never revealed" and which Plaintiff did not discover until Xenick's December 2017 email.  *See* Pl. Opp'n at 14; *see also id.* at 17, 20.  Plaintiff argues that the statute of limitations should thus be waived and/or tolled to "prevent Roth from benefitting from his wrongdoing," *id.* at 14, particularly since "the omissions here were material, they were concealed,

[and] they were in contradiction to Roth's duties as an attorney," *id.*, and because Plaintiff "relied on the concealment [sic] payment by investing in [the Project]," *id.* at 20.[5]

## A.  Equitable Estoppel

Equitable estoppel bars defendants from relying on the statute of limitations as a defense where "the defendant takes active steps to prevent [the] plaintiff from suing in time." *Heins v. Potter*, 271 F. Supp. 2d 545, 552 (S.D.N.Y. 2003) (citation omitted).  Equitable estoppel is, however, "a doctrine to be 'invoked sparingly and only under exceptional circumstances.'" *Abercrombie*, 438 F. Supp. 2d at 265 (quoting *Gross v. N.Y.C. Health & Hosps. Corp.*, 122 A.D.2d 793, 794 (2d Dep't 1986)).  "Equitable estoppel can apply when a defendant either affirmatively makes a false statement that plaintiff relies upon in not filing a complaint, or deliberately conceals facts underlying a claim which he is under a duty to disclose." *Tenamee*, 438 F. Supp. 2d at 444.

It is well established that equitable estoppel applies only when a defendant engages in "affirmative misconduct, [a]fter his initial breach of duty," which "produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Renz v. Beeman*, 589 F.2d 735, 750 (2d Cir. 1978) (citation omitted); *see also Smith v. Smith*, 830 F.2d 11, 13 (2d Cir. 1987) ("The doctrine of equitable estoppel usually comes into play when some conduct by a defendant after his initial wrongdoing has prevented the plaintiff from discovering

---

[5] Plaintiff seems to use the phrases "equitable estoppel" and "equitable tolling" interchangeably.  *See, e.g.*, Pl. Opp'n at 14.  While the doctrines are similar—and New York courts sometimes use the terms interchangeably as well—federal courts nonetheless distinguish between the two.  *See Tenamee*, 438 F. Supp. 2d at 443 n.3; *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 264 n.22 (S.D.N.Y. 2006).  Indeed, "[e]quitable tolling is distinct from the doctrine of equitable estoppel; equitable tolling prevents the running of a statute of limitations against a plaintiff who is unaware that he has a cause of action because of defendant's fraudulent acts or concealment," *Bennett v. U.S. Lines, Inc.*, 64 F.3d 62, 66 (2d Cir. 1995), whereas "equitable estoppel is invoked in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused him to delay in bringing his lawsuit," *Cerbone v. Int'l Ladies' Garment Workers' Union*, 768 F.2d 45, 50 (2d Cir. 1985).  The distinction, however, does not change the Court's conclusion here, as both doctrines are inapplicable to Plaintiff's claims.

or suing upon the initial wrong"); *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) ("It is therefore fundamental to the application of equitable estoppel [under New York law] for plaintiffs to establish that subsequent and specific actions by defendants somehow kept them from timely bringing suit."); *Tenamee*, 438 F. Supp. 2d at 445 ("New York law is clear that the same act of non-disclosure cannot underlie both the argument for estoppel and the related cause of action."); *Kaufman*, 307 A.D.2d at 122 ("[E]quitable estoppel does not apply where the misrepresentation or act of concealment underlying the estoppel claim is the same act which forms the basis of plaintiff's underlying substantive cause of action.").   Equitable estoppel thus requires an additional act, "separate and distinct" from the alleged misconduct underlying the action.  *Bisson v. Martin Luther King Jr. Health Clinic*, 399 F. App'x 655, 656-67 (2d Cir. 2010).  "Moreover, in order to demonstrate a basis for the application of equitable estoppel, a plaintiff must allege more than that the defendant remained silent regarding the initial wrong."  *Tenamee*, 438 F. Supp. 2d at 445; *see McDonald v. Edelman & Edelman, P.C.*, 118 A.D.3d 562, 563 (1st Dep't 2014) (finding "defendants' alleged mere silence. . .  insufficient to invoke the doctrine of equitable estoppel").

Plaintiff asserts that Defendants concealed the referral fee that they received from the $45,000 payment, as well as other "information that they withheld" from Plaintiff regarding their relationship with Tap House Holdings.  *See* Pl. Opp'n at 14, 20.  Any alleged concealment of Defendants' receipt of the referral fee or any other information in connection with the Project, however, is the very same alleged misconduct on which Plaintiff's malpractice, breach of fiduciary duty, and § 349 claims are premised.  Plaintiff pleads no facts suggesting that Defendants have engaged in some *subsequent* wrongdoing, separate from their initial misconduct.  In fact, Plaintiff does not allege any communications with Defendants following his subscription to the Project, let

alone communications in which Defendants intended to conceal prior misconduct or prevent Plaintiff from timely filing suit.  The Court thus concludes that equitable estoppel does not apply here.  *See, e.g.*, *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 492 (2007) (concluding that equitable estoppel did not apply because defendant did not engage in "subsequent or specific action" that kept the plaintiff from timely bringing suit); *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 789 (2012) ("Plaintiffs here have not alleged an act of deception, separate from the ones for which they sue, on which an equitable estoppel could be based.").

### B.  Equitable Tolling

Under the doctrine of equitable tolling, district courts may extend the statute of limitations period beyond the time of expiration as "a matter of fairness where a plaintiff has been prevented in some extraordinary way from exercising his rights." *See Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996) (internal quotation marks and citation omitted).  Equitable tolling, however, applies only in "rare and exceptional circumstances," where the plaintiff "has acted with due diligence but some egregious conduct by [the] defendant or a third party, or some other exceptional circumstance beyond his control[,] makes a timely filing impossible." *See Tenamee*, 438 F. Supp. 2d at 444 (quoting *Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000)); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 85 (2d Cir. 2002) (explaining that the equitable tolling doctrine is intended to apply to "a situation where a plaintiff could show that it would have been *impossible* for a reasonably prudent person to learn about his or her cause of action") (internal quotation marks and citation omitted) (emphasis in original).

The burden is on the plaintiff, who, "[t]o qualify for equitable tolling, . . . must establish that extraordinary circumstances prevented him from filing his claim on time, and that he acted with reasonable diligence throughout the period he seeks to toll." *Phillips v. Generations Family*

15

*Health Ctr.*, 723 F.3d 144, 150 (2d Cir. 2013) (quoting *Doe v. Menefee*, 391 F.3d 147, 159 (2d Cir. 2004)) (alterations omitted).  Courts have consistently denied application of equitable tolling where the plaintiff has failed to plead such extraordinary circumstances.  *See, e.g.*, *A.Q.C. ex rel. Castillo v. United States*, 656 F.3d 135, 144 (2d Cir. 2011) (denying request for equitable tolling on malpractice claim because plaintiff did not demonstrate "rare and exceptional circumstance[s]"); *Guo v. IBM 401(k) Plus Plan*, 95 F. Supp. 3d 512, 529 (S.D.N.Y. 2015) (declining to equitably toll breach of fiduciary claim because plaintiff did not allege facts to support extraordinary circumstances which prevented timely action); *Chepilko v. Cigna Life Ins. Co. of N.Y.*, 952 F. Supp. 2d 629, 633 (S.D.N.Y. 2013) (declining to toll breach of fiduciary claim because plaintiff did not allege circumstances that "justify the extraordinary application of equitable tolling" or "reasonable diligence in pursuing his claim").

Plaintiff has not alleged any facts demonstrating "extraordinary circumstances" that prevented him from filing his claims within the three-year period.  *Phillips*, 723 F.3d at 150.  Nor does he plausibly allege that he acted with "due diligence[] to discover facts that would allow him to bring his claim in a timely manner" through the period he seeks to toll.  *See De Sole v. Knoedler Gallery, LLC*, 974 F. Supp. 2d 274, 318 (S.D.N.Y. 2013).  Although Plaintiff contends that he only "discovered" Defendants' deceptive behavior—which they allegedly concealed—when he received Xenick's December 2017, *see* Pl. Opp'n at 2, he has not pleaded any facts to establish that he was prevented from pursuing his claims during the statute of limitations period, or that any "extraordinary circumstance" would support tolling here.

Because Plaintiff has not satisfied his burden of demonstrating that equitable estoppel or equitable tolling is applicable here, his untimely claims must be dismissed.

### III. Leave to Amend

As noted above, Plaintiff concedes that Counts II (breach of contract), III (breach of good faith and fair dealing), and IV (unjust enrichment/quantum meruit) are subject to dismissal "as pled" because they overlap with his malpractice and breach of fiduciary duty claims. *See* Pl. Opp'n at 21. He requests, however, "leave to replead" these claims. *See id.* Plaintiff asserts in particular that he "will seek to replead and recover specifically for the improperly disclosed payment based upon its true status," which he contends is "outright theft and fraud." *See id.*

At this point, the Court agrees with Defendants that Plaintiff's request for leave to replead Counts II, III, and IV is a conclusory one. *See* Defs. Reply at 9. Although the Court is skeptical that granting leave to amend would not be futile, in light of Rule 15(a)(2)'s "permissive standard," *see Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015), it will nonetheless permit Plaintiff to seek leave to amend, so long as he has a good faith basis to do so. Thus, to the extent Plaintiff still seeks to amend his complaint, including to cure the deficiencies identified in this Opinion, he shall file a motion for leave to amend no later than August 17, 2020.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted. If Plaintiff seeks to amend his complaint and has a good faith basis to do so, he shall file motion for leave to amend no later than August 17, 2020. The Clerk of Court is respectfully directed to terminate the motion pending at Dkt. 28.

SO ORDERED.

Dated:      July 17, 2020
            New York, New York

_____
Ronnie Abrams
United States District Judge

18